<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

———————————————————————
|                          | :  |                          |
| THOMAS VIRDEN,           | :  |                          |
|                          | :  |                          |
|              Plaintiff,  | :  | Civil No. 11-3926 (RBK)  |
|                          | :  |                          |
|          v.              | :  | **OPINION**              |
|                          | :  |                          |
| MICHAEL J. ASTRUE, Commissioner | : |                   |
| of Social Security       | :  |                          |
|                          | :  |                          |
|              Defendant.  | :  |                          |
———————————————————————

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Thomas Virden ("Plaintiff")

from the decision of the Commissioner of Social Security (the "Commissioner") denying

Plaintiff disability insurance benefits ("DIB") pursuant to Section 205(g) of the Social Security

Act ("the Act"), 42 U.S.C. § 405(g).  For the reasons expressed below, the Court will affirm

Commissioner's final decision, dated May 25, 2011, holding that Plaintiff is neither entitled to

disability insurance benefits ("DIB") under Title II nor eligible for Supplemental Security

Income (SSI) under Title XVI of the Social Security Act ("the Act").

**I.      BACKGROUND**

   **A. Procedural History**

On August 2, 2007, Plaintiff filed an application with the Social Security Administration

(the "Administration") for DIB and SSI, alleging that he became disabled as of December 19,

2006 due to a left side parotid gland lipoma, left knee pain, and cardiomyopathy.  Tr. 14.

Plaintiff's claim was denied initially and upon reconsideration.  Tr. 63-68.  Thereafter, on August 27, 2008, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 69-70. Plaintiff appeared before ALJ Ramon Quinones on July 26, 2010 by way of a video hearing.  Tr. 79-84.  On August 12, 2010, ALJ Quinones found that Plaintiff was not disabled within the meaning of the Social Security Act at any time between December 31, 2006, Plaintiff's alleged disability onset date, and August 12, 2010, the date of the ALJ's decision.  Tr. 14.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on May 25, 2011.  Tr. 1-8.

Seeking district court review of the ALJ's decision, Plaintiff filed an application to proceed in forma pauperis in the United States District Court District of New Jersey on July 8, 2011.  Doc. No. 1.  The application was granted on July 13, 2011, and Plaintiff filed a Complaint in the District of New Jersey on the same day.  Doc. No. 2.

## B. Plaintiff's Work History

Plaintiff worked in carpet cleaning from 1991 to 2000.  Tr. 124.  From 2000-2003, he worked for Shared Systems Technology, an engineering and construction company, in a field Plaintiff self-described as "refractory restoration."  Id.  In 2003, Plaintiff worked for Gloucester City Box Works as a box maker until his thumb injury occurred in 2005.  Tr. 124.  Finally, Plaintiff was employed by Champ One Construction in the home remodeling business from 2005 to December, 2006.  At Champ One Construction, Plaintiff earned $180/day.  Tr. 130.  He operated machines and tools and used technological knowledge or skills, but was not responsible for any report writing.  Id.  Each day, he was required to walk and stand for half an hour, climb and crouch for one hour, kneel for two hours, and handle, grab or grasp for three hours.  Id.

2

Prior to his injury, plaintiff frequently lifted 25 pounds and sometimes lifted 100 pounds or more.  Id.

**C.  Plaintiff's Physical Condition and Medical History**

We begin the discussion in chronological order of Plaintiff's medical history.   Plaintiff's alleged disability is caused by a left side parotid gland lipoma, left knee pain, and cariomyopathy.  At the ALJ hearing, Plaintiff described experiencing multiple symptoms, which he attributes to the parotid gland lipoma.  He reported experiencing "persistent headaches," progressive blindness in the left eye, and hearing loss in the left ear.  Tr. 34-36.  Plaintiff  stated that these symptoms make it "very hard to maintain any type of physical activity throughout the day."  Tr. 35.  Plaintiff reported having the tumor extracted,[1] but following the surgery the tumor reoccurred and grew to the size of a "baseball" over the course of several years.  Tr. 35.  Plaintiff also reported dizziness when staring at an object for more than 10 to 15 minutes, sleep apnea, "a slight broken bone in the foot," a ruptured bursa sac in the elbow, synoptic episodes, diabetes, and a burning sensation in the legs.  Tr. 37-38.

Plaintiff described himself as "unable to maintain any . . .  sort of daily work."  Tr. 34. Plaintiff testified that he is unsure of how far he can walk, and, after walking, sometimes experiences foot swelling the following day.  Tr. 40.  He stated that he is able to stand for 15 to 20 minutes unless his foot "starts to feel like a balloon," and can sit "for a little bit longer than I can stand," but may experience a burning sensation in the bottom of his feet.  Id.  Plaintiff lives in a friend's eight by twenty foot garage and uses the house for cooking and showering.  Tr. 39. At the ALJ hearing, he reported feeling "bitter" about his situation.  Tr. 45.

---

[1] Plaintiff testified that the lipoma was extracted in 1999 in his ALJ hearing; in fact, the surgery took place on January 5, 2001.

Plaintiff's relevant medical history began in 1991, when he was hit by a recycling truck, suffering knee and back injuries.  Tr. 48.  He reported undergoing six arthroscopic surgeries in his left knee and an ACL reconstruction.  Id.  Plaintiff decided not to undergo back surgery to repair two resulting herniated disks.  Tr. 49.

In 2001, Plaintiff consulted Dr. Bresalier, an otolaryngologist, regarding a mass in his left cheek and hearing loss.  Tr. 200.  Dr. Bresalier ordered a hearing exam and CT scan and recommended Plaintiff participate in a sleep study.  The hearing exam showed high frequency hearing loss in the left ear and the CT scan revealed a small lipoma in Plaintiff's parotid region.  Tr. 203-208.  There is an absence of evidence regarding whether Plaintiff underwent the recommended sleep study.  Based on the results of the CT scan, Dr. Bresalier recommended removal of the lipoma.  Tr. 208.  The surgery took place on January 15, 2001.  Tr. 209.  On February 9, 2001, Dr. Bresalier determined that the mass was successfully removed without complications.  Tr. 215.

On February 3, 2004, Plaintiff injured his thumb while working for Gloucester City Box Works.  Tr. 217.  Dr. Lipshultz, an orthopedic surgeon, evaluated Plaintiff on March 8, 2004, and recommended exploratory thumb surgery, which revealed "an articular cartiage defect as well as a small bony defect."  Tr. 219.  Dr. Lipshultz extracted the bony fragment, but Plaintiff reported continued pain.  Tr. 219-221.  On June 29, 2004, Dr. Lipshultz cleared Plaintiff for light duty, but performed surgical fusion of the MP joint, which reduced his discomfort.  Tr. 221-224.  Plaintiff was reevaluated on December 2, 2004 and diagnosed with tendonitis.  Tr. 227.  Dr. Lipshultz prescribed Celebrex and recommended continued restrictions of light duty, but Plaintiff reported that his company did not have light or restricted duty available; therefore, he

4

remained out of work.  Tr. 227-8.  On April 5, 2005, Dr. Lipshultz cleared Plaintiff for full duty.
Tr. 232.

On December 27, 2006, Plaintiff was transported by ambulance to Cooper University
Hospital emergency room complaining of "neck pain" relating to his "jaw tumor" and periods of
"blacking out."  Tr. 244-245.  Plaintiff returned the following day and received a CT scan, which
revealed a lipoma in the left parotid region.  Tr. 246-250.  He was prescribed Tylenol for pain
and referred to an ear, nose and throat specialist for a follow-up.  Tr.253.  Plaintiff received
another CT scan on May 17, 2007, which showed no change in the lipoma.  Tr. 258-259.

The hospital referred Plaintiff to Dr. Houston, an otolaryngologist. Tr. 253.  On June 28,
2007, Dr. Houston evaluated Plaintiff's recurrent lipoma, observing that "[patient] wants it out[;]
he relates all his problems including employment to the mass" and noted that Plaintiff "claim[ed]
to get dizzy, have visual and hearing problems from mass."  Tr. 262-263.  After reviewing
another CT scan several months later, Dr. Houston determined that the lipoma was "unchanged."
Tr. 267-269.

Dr. Klausman performed an internal medical evaluation on December 4, 2007 at the
request of New Jersey Department of Labor and Work Force Development Division of Disability
Determinations Services.  Tr. 273-277.  Plaintiff reported shortness of breath, foot pain, chest
pain, sleep apnea, and "headaches every day lasting all day" with nausea and fatigue, but did not
take any medication for his symptoms.  Tr. 274.  He stated that he could no longer "drive, use
mechanical tools or anything that vibrates" or work "due to frequent headaches."  Tr. 274- 275.

Plaintiff stated that he exercised regularly, "walking 10 miles a week," but had difficulty
with prolonged standing, walking, sitting, climbing, crawling, bending, laying on his stomach or

back, kneeling or squatting.  Tr. 274-275.  He reported no restrictions in bathing and grooming, but difficulty cleaning, carrying groceries, and doing laundry.  Tr. 275.  He also described difficulty sleeping and functioning sexually.  Tr. 275.  Dr. Klausman observed that Plaintiff's visual acuity was 20/40 in the right eye,  20/70 in the left eye, and 20/30 in both eyes, without glasses.  Tr. 278.  Plaintiff was able to "hear a normal conversation."  Tr. 276.  His fine movements were within normal limits on the left hand and "within normal limits on the right except the thumb range of motion."  Tr. 276.  Plaintiff had a normal lumbar range of motion with slightly decreased knee range of motion of the left and localized back pain from straight leg raises on the right with no pain on the left.  Tr. 276.  Plaintiff had a slight loss of strength (rated by Dr. Klausman as 4/5) in the left knee.  Tr. 277.

At the request of the Commissioner, Dr. Burger conducted a non-consulting case analysis on December 21, 2007 and found that although Plaintiff reported "impairment due to headaches and a brain tumor," "the overall ME [medical exam] does not support a severe impairment due to chronic daily headaches treated with Tylenol or nothing," nor the existence of a brain tumor.  Tr. 278.

On January 19, 2008, at the request of the Commissioner, Dr. Przbyla conducted a SSD cardiology case analysis and found that although Plaintiff reported "cardiomyopathy with AOD [alcohol and other drug abuse]," "chest pain daily lasting 5-10 min[utes] with strenuous physical activity," and "SOB [shortness of breath] on walking one block," there was insufficient evidence to substantiate Plaintiff's reports.  Tr. 279.  The same day, Dr. Park reviewed Plaintiff's medical file to produce a Physical Residual Functional Capacity ("RFC") Assessment at the request of the Commissioner.  Tr. 280-287.  Dr. Park found that Plaintiff had no postural limitations in

balancing, stooping, kneeling, crouching or crawling, but could never climb ladders, ropes, or scaffolds.  Tr. 282.  Plaintiff had no manipulative limitations other than fine manipulation restrictions in his right thumb.  Tr. 283.  Dr. Park reported no communicative or environmental limitations, but found that Plaintiff could only lift about 10 pounds and sit for six hours in an eight-hour workday.  Tr. 284, 287.  Overall, Dr. Park concluded that Plaintiff had a decreased RFC because his "pain and allegation[s] are grossly supported by [prior medical exams]."  Tr. 287.

At the request of the Commissioner, Dr. Waters, a licensed psychologist, prepared a SSD psychological consultative examination report on July 1, 2008, and diagnosed Plaintiff with "adjustment disorder with depressed mood."  Tr. 288-292.  However, Dr. Waters concluded that Plaintiff's "mental status plays a less significant role in his occupational limitations."  Tr. 291. On July 7, 2008, Dr. Sanford completed a psychiatric review for SSD and concluded Plaintiff's psychiatric impairments were not severe.  Tr. 293-306.  Dr. Sanford found that Plaintiff had no restrictions in daily living activities, no difficulties in maintaining concentration, persistence or pace, but had mild difficulties maintaining social functioning.  Tr. 303.  Overall, Dr. Sanford found Plaintiff's allegations "partially credible [but] he does not meet/equal the Listings."  Tr. 305.

At the request of Commissioner, Dr. Klein preformed a comprehensive physical exam on July 17, 2008 and diagnosed Plaintiff with "status post work-related injury requiring left knee surgery," "status post right hand dorsum surgery," "status post left hand palmar surgery," "alleged history of cardiomegaly," and "recurrent parotid gland tumor."  Tr. 310.  Also at the request of the Commissioner, Dr. Golish, a non-examining medical consultant, prepared another

7

RFC on August 19, 2008.  Tr. 311-318.  The assessment established that Plaintiff could occasionally lift up to 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had no limitations in pushing or pulling.  Tr. 312.  Under postural limitations, Plaintiff could occasionally climb, stoop, and kneel, but never balance, crouch or crawl.  Tr. 313.  Dr. Golish found no speaking limitations, but found limited hearing in the left ear, although Plaintiff's hearing was not formally tested.  Tr. 315.  Plaintiff had few environmental limitations apart from the instruction to avoid extreme cold and hazardous machinery or heights.  Tr. 315.  Overall, Dr. Golish concluded that the severity and duration of Plaintiff's symptoms were only partially consistent and proportionate to his medically determinable impairments based on the evidence provided by "statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits."  Tr. 316.

On November 20, 2009, Plaintiff saw Dr. Colletti, a general optometrist, for an eye exam. Tr. 328.  Dr. Colletti diagnosed non-specific vision loss and referred Plaintiff to Dr. Moster, a neuro-ophthalmologist.  Dr. Moster found no explanation for Plaintiff's alleged neuropathy or vision loss since there was "no extension [of the parotid lipoma] anywhere near the optic nerve." Tr. 329.  Dr. Moster recommended plaintiff undergo a blood test and an MRI of the optic nerve to check for other causes of his slowly progressive vision loss.  Tr. 329-331.  Dr. Colletti completed a vision impairment questionnaire based on Dr. Moster's findings and concluded that Plaintiff has "unexplained visual acuity loss [left] eye," but concluded that plaintiff "has other health issues which would have more of an impact on [work limitations] than these eye[] [issues] would."  Tr. 332-333.

## II.     STANDARD FOR REVIEW OF COMMISSIONER'S DECISION

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360).  A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277, 284-285 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to

scrutinize the record as a whole to determine whether the conclusions reached are rational.")
(quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not
substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to
resolve, a conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human
Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.   DISCUSSION

In order to qualify for DIB, a claimant must establish that he is disabled.  42 U.S.C. §
423(a)(1)(E).  A claimant is disabled if he is unable to "engage in any substantial gainful activity
by reason of any medically determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last for a continuous period of not less
than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment(s) must prevent him not
only from doing his previous work, but also from "engag[ing] in any other kind of substantial
gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner conducts a five-step inquiry to determine whether a claimant is
disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The
Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful
activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The
Commissioner then ascertains whether the claimant is suffering from a severe impairment,
meaning "any impairment or combination of impairments which significantly limits [the
claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If
the Commissioner finds that the claimant's condition is severe, the Commissioner determines
whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is

equivalent to a listed impairment, the claimant is entitled to benefits and the Commissioner's

inquiry ends; if not, the Commissioner continues to step four to evaluate the claimant's RFC and

analyze whether the RFC would enable the claimant to return to his "past relevant work."  20

C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of

disability.  If the Commissioner finds the claimant unable to resume past relevant work, the

burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work

available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20

C.F.R. § 404.1520(f)).

The ALJ began his analysis in this case by finding that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2009.  Tr. 16.  Proceeding to the

five-step disability inquiry, the ALJ also found that Plaintiff had not engaged in substantial

gainful activity since December 19, 2006.  Id., see also 20 C.F.R. § 404.1571 et seq., and

416.971 et seq.  The ALJ then found that Plaintiff did suffer from:

> severe medically determinable impairments that cause significant limitation in the
> claimant's ability to perform basic work activities: the status post fusion of the right
> thumb metacarpal joint with permanent limitation of motion; occasional episodes of
> dizziness; some hearing loss by the left ear that does not affect speech discrimination;
> some vision loss by the left eye with preserved vision in the right eye; obesity and the
> status post the left knee reconstruction in 1993, with crepitance [sic] but no instability (20
> CFR 404.1520(c) and 416.920(c)).

Tr. 16.

However, the ALJ found that, although Plaintiff had a left parotid lipoma, this "medical[]

impairment has not been shown to cause work related limitations."  Id.  20 C.F.R. § 404.1521.

Proceeding to step four of the five-step analysis, the ALJ determined that Plaintiff's severe

impairments did not "meet[] or medically equal[] one of the listed impairments in 20 CFR Part

11

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  Tr. 22.  The ALJ then found that Plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(c) and 416.967(c).[2]  The ALJ concluded that Plaintiff could sit, stand, walk, push, and pull arm or leg controls and that he could lift and carry occasionally 20 pounds and frequently 10 pounds.  Additionally, the ALJ determined that Plaintiff can sit, stand and walk about six hours in an eight-hour workday and occasionally climb stairs, balance, stoop and kneel but should not climb rope, or scaffolds, nor crouch or crawl.  Tr. 23.  Further, Plaintiff's only environmental limitations are extreme cold and other hazards such as unprotected heights, moving machinery and driving.  Id.  Finally, the ALJ determined that Plaintiff "should not be required [to employ] depth perception and a full field of vision, but is able to work with large objects and avoid ordinary hazards in the workplace."  Id.

 This RFC, the ALJ determined, meant that Plaintiff was unable to perform any past relevant work as a construction worker, as such work would be classified as "heavy work."  Tr. 25, see also 20 C.F.R. § 404.1565.

The ALJ then performed the final step of the disability analysis: assessing whether the claimant was able to do any other work, considering his RFC, age, education, and work experience.  Tr. 25.  If the claimant is able to perform all, or substantially all, of the extertional

---

[2] The ALJ cited the requirements of light work from 20 CFR 404.1567(c) and 416.967(c).  It appears to the Court that the definition is found in 20 CFR 404.1567(b) and 416.967(b).  Light work is defined in these sections as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  CFR 404.1567(b).

12

demands at a given level of exertion *and* has nonexertional limitations, the medical vocational

rules are used as a framework for decision-making, "unless there is a rule that directs a

conclusion of 'disabled' without considering additional exertional and/or nonexertional

limitations."  SSRs 83-12 and 83-14.  Additionally, if the claimant has the RFC to perform the

full range of light work, considering his age, education, and work experience, Medical-

Vocational Rule 202.20 directs a finding of "not disabled."  Because the application of the

medical vocational rules were appropriate, the ALJ satisfied his burden to demonstrate the

availability of light work jobs in the national economy. See discussion infra. Section III.B.

Plaintiff contends his right thumb injury limits his ability to perform tasks involving fine

dexterity; however, the ALJ cites Social Security Ruling ("SSR") 83-10 which states that

although light work "require[s] use of arms and hands to grasp and to hold and turn objects . . .

they generally do not require use of the fingers for fine activities to the extent required in much

sedentary work."  Tr. 26.  Additionally, under light work Plaintiff will not be required to crouch,

climb ladders or scaffolds, and will not be subject to the aforementioned environmental

limitations.  SSR 83-10, Tr. 26.  Further, Social Security Ruling 85-15 states that "hearing

impairments do not necessarily prevent communication, and differences in types of work may be

compatible with various degrees of hearing loss" and even a claimant who "retains sufficient

visual acuity to be able to handle and work with rather large objects (and has the visual fields to

avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining

across all exertional levels."  SSR 85-15; Tr. 26.  Based on these findings, the ALJ determined

Plaintiff was not disabled under the medical-vocational framework.  Id.

Plaintiff claims that the ALJ erred in five ways.  First, Plaintiff argues that the ALJ failed to properly determine Plaintiff's RFC pursuant to SSR 96-8P and follow step five of the sequential evaluations.  Pl. Br. 7.  Second, Plaintiff claims that the Commissioner's RFC finding failed to adhere to SSR 96-8P, 96-9P, 00-04P, and AR 01-1(3).  Pl. Br. 10.  Third, Plaintiff contends that the ALJ failed to properly assess Plaintiff's obesity pursuant to SSR 02-1P.  Pl. Br. 15.  Fourth, Plaintiff argues that the ALJ improperly discounted Plaintiff's testimony of disabling pain and limitations Pl. Br. 17.  Finally, Plaintiff claims that the ALJ failed to properly evaluate and weigh the medical evidence of record.  Pl. Br. 22.  These arguments are addressed in turn below.

### A.  The ALJ Properly Determined Plaintiff's Residual Functioning Capacity

If a claimant demonstrates the inability to return to his or her past relevant work, at step five the Commissioner  must demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy" considering the claimant's RFC, age, education, and past work experience.  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)); SSR 96-8P. Although the burden shifts to the Commissioner at this step, it remains the claimant's responsibility to provide medical or other evidence to determine his or her RFC.  Bowen v. Yuckert, 482 U.S. 137, 146, n.5; SSR 96-8P.  The RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  96-8P.  At each RFC level, the claimant must be able to perform all, or substantially all, of the activities listed.  SSR 83-10.  As discussed below, the Court finds that the ALJ properly considered the medical evidence in finding that Plaintiff could perform the full range of light work.

14

First, Plaintiff claims that "nowhere in the Opinion is the 'function-by-function' assessment, required by 96-8P, nor is there any comparison between the actual functions required by light work as compared to the functions that Claimant can still perform as indicated in his RFC."  Pl. Br. 9-10.  In fact, the Opinion of the ALJ cited the RFC assessment of Dr. Golish, which stated:

> The claimant has no limitation, related to a medically determinable impairment, to sit, stand, walk, push, and pull arm[], or leg[] controls and he can lift and carry occasionally 20 pounds and frequently 10.[3]  He can sit, stand, and walk about 6 hours in an 8-hour workday.  He can occasionally climb stairs, balance, stoop, and kneel, but should not climb ladders, rope, or scaffolds, nor crouch or crawl.

Tr. 23; see  Tr. 311-315.

Thus, the ALJ properly conducted a function-by-function assessment, directly addressing the requirements promulgated in the definition of "light work," including Plaintiff's ability to sit, stand, walk, lift, stoop, and crouch.  CFR 404.1567(c).

Second, Plaintiff claims that there is no stated consideration given to his severe impairments, which included hearing loss, vision loss, dizziness, obesity, and status-post thumb and knee surgeries impairments.  Pl. Br. 10.  On Plaintiff's visual and hearing loss, the ALJ specifically stated, "Even though the cause of claimant's visual and hearing loss medical [sic] is unknown, still these conditions are not so severe as to be disabling."  Tr. 24; 20 CFR Part 404, Subpart P, Appendix 1, § § 2.02 and 2.08.  The ALJ's determination is consistent with the visual evaluation of Dr. Colletti, who found that Plaintiff could work with large objects, and would not need to take unscheduled breaks during an 8-hour workday.  Tr. 332-334.  Additionally, Dr.

---

[3] The only evidence of record which indicated that Plaintiff may have greater occupational limitations was Dr. Park's determination that Plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, and could stand and/or walk at least 2 hours in an 8-hour workday.  Tr. 280-287.  However, it is well established that "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor of another."  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-6. Therefore, the Court finds no error in the ALJ's decision to credit Dr. Golish's testimony over Dr. Parks.

Golish determined Plaintiff had only limited hearing loss in the left ear, although his hearing was not tested.  Tr. 315.  It appears that Plaintiff's sole hearing exam of record occurred in 2001, which only revealed high frequency hearing loss in the left ear.  Tr. 203-208.

Furthermore, the ALJ specifically considered Plaintiff's alleged dizziness, stating that although the cause of the symptoms was not established, "there is evidence that he has been treated for these conditions, and, therefore, these are considered medically determinable impairments that restrict him from participating in activities in which the sudden loss of balance could be a risk, so he has some environmental limitations," including avoiding "unprotected heights."  Tr. 21, 23.  These environmental limitations were taken into account in Step Five, where the ALJ stated that "environmental restrictions would also not significantly affect the potentially unskilled light occupational base."  Tr. 26.

The ALJ also carefully considered right thumb limitations, finding "the right thumb fusion does affect the claimant's grip strength of the right hand;" however, these restrictions do not affect Plaintiff's ability to perform light work.  ("Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers.  Rather, they require gross use of the hands to grasp, hold, and turn objects."  SSR 83-14.)

Plaintiff's knee condition was also duly considered.  The ALJ stated that Plaintiff could only occasionally "climb stairs, balance, stoop, or kneel, due to his knee condition."  Tr. 20. These restrictions do not affect Plaintiff's occupational base, since light work only occasionally requires stooping and bending, while kneeling and crawling only affect a claimant's ability to perform "medium work."  SSR 83-14.

16

Finally, Plaintiff's obesity was properly considered.  Obesity is a "medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity."  20 C.F.R. § 404 App. 1, Q; SSR 02-1P.  The ALJ determined that Plaintiff's obesity was not shown to increase the severity of coexisting or related impairments, and did not have any effect on the knee joint or the ability to "ambulate effectively."  Tr. 22; SSR 02-1P.  Further, the ALJ acknowledged that "since 1993, [Plaintiff's knee condition] has not required treatment and has not precluded him from performing heavy exertional efforts."  Tr. 24.

Plaintiff contends that "at Steps Four and Five, the Opinion made no attempt to discuss how Plaintiff's ability to sit, stand, walk, lift and carry over a period of time, nor did it discuss how obesity, in combination with his other impairments, may cause additional pain and limitation of function."  Pl. Br. 17.  On the issue of obesity, SSR 02-1P states, "an assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment."  As mentioned above, the ALJ determined that Plaintiff's obesity was not shown to increase the severity of coexisting or related impairments,  including potential impact on the knee joints or the ability to ambulate effectively.  Tr. 22.  Although the ALJ does not explicitly extrapolate every potential effect obesity might have on the Plaintiff, the "substantial evidence" standard does not require every possible fact to be found.  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  A reasonable person would conclude that the ALJ properly considered the likely impacts of obesity on the Plaintiff's ability to perform light work

based on the medical evidence of record.  Therefore, the Court finds that the ALJ's conclusion regarding obesity was based on substantial evidence.

Third, Plaintiff claims that the Opinion provides "no guidance as to what size 'large objects' may be, and fails to describe the 'ordinary' work hazards" to avoid."  Pl. Br. 10. Although it is true that the ALJ does not provide specific parameters as to the size of objects Plaintiff can handle, the "light work" category requires the frequent lifting or carrying of objects weighing up to 10 pounds, which can reasonably reflect the size limitations of "large objects" that Plaintiff's can work with. See CFR 404.1567(c).  Further, the description of "work hazards" is explained in the paragraph preceeding Plaintiff's quotation of the ALJ Opinion as "unprotected elevations and proximity to dangerous, moving machinery."  These hazards do not constitute significant restrictions at Plaintiff's level of "light work."  Tr. 26.

### B. The Commissioner's Residual Function Capacity Properly Adhered to Rulings 96-8P, 96-9P, 00-04P, AR 01-1(3) and the ALJ Properly Assessed Plaintiff's Obesity Pursuant to SSR 02-1P

The Court finds that the Commissioner's determination did not fail to adhere to Social Security Rulings.  Plaintiff first points to SSR 96-8P, which states, "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8P.  Plaintiff alleges that the ALJ's opinion did not consider "all of the relevant factors," including non-severe impairments, in the RFC assessment.  Tr. 11.  Although the ALJ must "consider the combined effect of multiple impairments, regardless of their severity," he or she is not required "to use particular language or adhere to a particular format in conducting his analysis."  Burnett v. Comm'r of Social Sec., 220 F.3d 112, 120 (3d Cir. 2000).

Based on the medical evidence of record, the ALJ determined that Plaintiff's lipoma, a non-severe impairment, "has not been shown to cause work related limitations."[4]  Tr. 16. This determination is based on the absence of any medical opinion relating the benign lipoma to any medical condition.  See Tr. 321-324, 329, 332.  Thus, the Plaintiff's allegation that his non-severe medical impairment was not considered or "well-reasoned" (Pl. Br. 11) is without merit.

Additionally, Plaintiff's mental condition, determined to be "not severe," was considered by the ALJ.  See Tr. 293-306.  Dr. Waters diagnosed Plaintiff with "adjustment disorder with depressed mood,"  but concluded that his "mental status plays a less significant role in his occupational limitations."  Tr. 288-292.  The ALJ was entitled to rely on this conclusion. Finally, the ALJ properly found that, based on the record, Plaintiff never sought treatment for his alleged sleep apnea, headaches, or adjustment disorder, yet he successfully and continuously sought treatment for his thumb and knee injuries.  Tr. 23-25;  see Tr. 48, 206-215, 219-232,

Second, Plaintiff cites SSR 96-9p, which requires, in addition to a RFC assessment, "an accurate accounting of the individual's abilities, limitations, and restrictions . . . to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource." However,  Plaintiff's reliance on SSR 96-9P is misguided.  These guidelines apply to "unskilled sedentary occupational base," where Plaintiff was determined to be capable of performing "light work."  SSR 96-9P (emphasis added).  Pl. Br. 11.  Therefore, SSR 96-9P does not apply.

---

[4] Plaintiff contends that the Opinion identifies the left parotid lipoma as a "severe" impairment (Pl. Br. 13); however, the Opinion states, "The claimant also has a left parotid lipoma, a medically determinable impairment that has not been shown to cause work related limitations." Tr. 16 (emphasis added). In contrast, the preceding sentence lists "severe medically determinable impairments that causes significant limitation in the claimant's ability to perform basic work activities." Id.  Therefore, the Court finds that the ALJ did not find the lipoma to be a severe impairment.

Third, Plaintiff cites SSR 00-4p, which states, in relevant part, "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." Pl. Br. 13. The Court notes that Plaintiff fails to state where such conflict exists. Accordingly, Plaintiff's claim must fail.

Finally, Plaintiff cites AR 01-1(3) and <u>Sykes v. Apfel</u>, 228 F.3d 259 (3d Cir. 2000), alleging that the ALJ was required to call a Vocational Expert to testify on the effects of Plaintiff's exceptional and non-exertional impairments on the occupational base.  Pl. Br. 15. Applying the grid rules in 20 CFR Part 404, Subpart P, Appendix 2 as a framework for decision-making without referring to a vocational expert or official administrative notice, the Court finds that the ALJ properly determined that because Plaintiff's non-exertional limitations would have little to no effect on the occupational base of unskilled light work, Plaintiff was "not disabled" under the Act.  Tr. 25-26.

The court in <u>Sykes</u> held that because the claimant had severe exertional and non-exertional impairments, the ALJ could not establish "that there are jobs in the national economy that Sykes can perform by relying on the grids alone, even if he uses the grids only as a framework instead of to direct a finding of no disability."  <u>Sykes v. Apfel</u>, 228 F.3d 259, 274 (3d Cir. 2000).  The court remanded the case, holding that, "in the absence of a rulemaking establishing the fact of an undiminished occupational base, the Commissioner cannot determine that a claimant's nonexertional impairments do not significantly erode his occupational base under the medical-vocational guidelines ("grids") without [] taking additional vocational

evidence." Sykes v. Apfel, 228 F.3d 259, 261 (3d Cir. 2000). The Social Security

Administration summarized Sykes in AR 01-1(3), which specifically stated:

> This Ruling does not apply to claims where we rely on an SSR that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects the claimant's occupational job base. When we rely on such an SSR to support our finding that jobs exist in the national economy that the claimant can do, we will include a citation to the SSR in our determination or decision.

AR 01-1(3), 2001 WL 65745 at *4 (S.S.A.).

The Court finds that Sykes is inapposite to the instant case. Here, the ALJ properly

addressed each of Plaintiff's non-exertional limitations, specifically pointing to SSR 96-9P, SSR

85-15, SSR 83-10 and SSR 83-14, and determining that Plaintiff's restrictions were considered

in the rulings and would not significantly erode the "light work" occupational base relevant to

Plaintiff's abilities. Tr. 26, SSR 83-14 ("Using the fingers and fingertips to work with small

objects; using the eyes and ears to see and hear . . . are considered nonexertional activities").

Additionally, Sykes is distinguished as follows by Allen v. Barnhart, 417 F.3d 396, 401-

407 (3d Cir. 2005): "because the grid's 'framework' clearly classifies work in terms of strength,

thus tying it to physical exertion . . . the Agency has used, and the courts are thus directed to

employ, the grids as a framework when nonexertional limitations are also at issue." Allen v.

Barnhart, 417 F.3d 396, 401 (3d Cir. 2005); see also Heckler v. Campbell, 461 U.S. 458 (1983)

(Commissioner can satisfy its burden of proof regarding availability of jobs in the national

economy via rulemaking rather than requiring actual evidence on a case-by-case basis. Thus,

Agency rulemaking, as long as it is not arbitrary or capricious, is permissible as a substitute for

individualized case-by-case determinations, thus doing away with the need for evidence to

support the determination at Step 5.). In Allen, the Third Circuit held that "if the Secretary

21

wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is <u>probative</u> as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base."  417 F.3d 396, 407 (emphasis added).

The Court finds that the ALJ considered the probative impact of the non-exertional limitations and found that it would have little to no effect on Plaintiff's occupational base, finding that the right thumb limitation of motion for fine manipulation is not required in the "light work" category, and conducting a function by function assessment of Plaintiff's motion, visual, hearing and environmental limitations.  Tr. 26.  Thus, because the SSR rulings were probative as to the way that Plaintiff's nonexertional limitations would affect the occupational base, the ALJ's reliance on the guidelines satisfied the agency's burden.

### C.  The ALJ Properly Considered and Rejected Plaintiff's Testimony of Disabling Pain and Limitations

Plaintiff contends that the ALJ erred in failing to properly account for Plaintiff's subjective complaints of pain.  This Court finds that the ALJ did adequately consider both Plaintiff's testimony and the medical records wherein Plaintiff complained of pain.  As the ALJ indicated, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  Tr. 23; <u>see also</u> <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067 (3d Cir. 1993) (finding that an ALJ must give "serious consideration" to a claimant's complaints of pain, but also that the ALJ must make a credibility determination where a claimant's complaints are unsupported by the evidence).

When a claimant's testimony regarding his or her subjective pain is supported by competent medical evidence, it is given great weight . Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir.1979); Hirschfeld v. Apfel, 159 F. Supp. 2d 802, 811 (E.D. Pa. 2001).  The ALJ, however, has discretion to determine a claimant's credibility, and may reject the claimant's testimony of disabling pain, as long as the conclusion is supported by specific reasoning, supported by the record.  Capoferri v. Harris, 501 F.Supp.  32, 37 (E.D.Pa.1980), aff'd, 649 F.2d 858 (3d Cir.1981).  Consequently, "if supported by substantial evidence, the ALJ's credibility findings may not be disturbed upon appeal." Van Horn v. Schweiker, 717 F.2d 871, 871 (3d Cir.1983); Smith v. Califano, 637 F.2d 968, 972 (3d Cir.1981); Hirschfeld v. Apfel, 159 F. Supp. 2d 802, 811 (E.D. Pa. 2001).

In this case, the ALJ did find that Plaintiff's "medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms;" however, the ALJ also found that the medical evidence did not show that the symptoms were of the intensity or persistence claimed.  Tr. 23; see 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1529, 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence.").  Here, the ALJ found that Plaintiff had a medically determinable impairment, but that Plaintiff was not credible as to the extent that his symptoms would prohibit him from performing "light work."  Tr. 23-26; see SSR 96-7p.  As discussed below, the Court affirms the ALJ's determination on credibility.

Plaintiff first argues that the ALJ disregarded the parotid gland lipoma as a cause of his vision loss, hearing loss, headaches, and dizziness.  Pl. Br. 20.  The Court finds that Plaintiff's

assertion that the parotid gland lipoma caused the aforementioned symptoms is unsupported by the medical evidence of record.  The three doctors who exaimed Plaintiff's lipoma concluded that the lipoma did not cause the allegedly disabling symptoms.  Dr. Golish found only decreased hearing in the left ear and  Dr. Klausman found that Plaintiff was able to "hear a normal conversation."  Tr. 24; see Tr. 315, 276.  Dr. Moster, a neuro-ophthamologist, found no explanation for Plaintiff's alleged neuropathy or vision loss since there was "no extension [of the parotid lipoma] anywhere near the optic nerve."  Tr. 329.  Additionally, there is no evidence of record that any medical professional attributed Plaintiff's headaches or dizziness to the lipoma.  Therefore, the ALJ did not abuse his discretion in rejecting Plaintiff's testimony regarding the correlation between the lipoma and other alleged symptoms.

Second, Plaintiff argues that the ALJ failed to consider his heel spurs, herniated discs, cardiovascular condition and the burning sensation in his legs.  Pl Br. 20.  On the contrary, the ALJ specifically stated:

> the claimant has alleged a cardiovascular condition, but again, there is no evidence of treatment for such a condition.  He has alleged herniated discs and heels spurs, but there is no medical evidence in file of such conditions, or, of treatment and, in fact, the clinical examinations have not shown the presence of any medical findings such as murmurs, spasms, pain, or limitation of motion related to such conditions.

Tr. 24.

Further, Dr. Golish determined that Plaintiff could "stand and/or walk about six hours in an eight-hour workday."  Tr. 274, 312.  Thus, the ALJ not only noted the lack of medical evidence purporting such disabilities, but also pointed to Plaintiff's clinical exams, which demonstrate the absence of these reported conditions.

Third, Plaintiff contends that the ALJ violated SSR 96-7P, which prohibits an adjudicator from "draw[ing] any inference about an individual's symptoms and their functional effects from a failure to seek to pursue regular medical treatment without first considering any explanations that the individual may provide or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment," in evaluating Plaintiff's headaches, and emotional disorder. Pl. Br. 22.   On the issue of headaches, the ALJ noted that "although he complains of severe, disabling, frequent headaches, there is no evidence that he procured or followed a consistent treatment for headaches; he only takes over the counter medication, if any." Tr. 24.  The record supports the ALJ's conclusion; Plaintiff reported to Dr. Burger that he took Percocet and Gabapentin for pain, Naproxen for arthritis, Lisinopril for his heart, Lipitor for cholesterol, and over-the-counter treatment for heartburn, without specifying any treatment for headaches.  Tr. 24.  Thus, because Plaintiff sought multiple treatments for other alleged symptoms, while failing to seek treatment specifically for his headaches, the ALJ did not err in finding that Plaintiff's "severe headaches" were not of the intensity or persistence claimed.  Tr. 289, 20 C.F.R. §§ 404.1529, 416.929.

Defendant's brief points to the fact that in 2007, Plaintiff reported to Dr. Klausman that he stopped working in December 2006 due to frequent headaches. However, in a psychological evaluation with Dr. Waters on July 1, 2008, Plaintiff explained that the company where he worked in 2006 went out of business, and that employers were dissuaded from hiring him due to his lipoma.  Def. Br. 24, Tr. 289, 291.  Although the ALJ did not specifically base his credibility determination on this discrepancy, Plaintiff's lack of credibility was otherwise affirmatively addressed in the Opinion, which included specific reasoning and evidence from within the

record; therefore, the ALJ did not abuse his discretion in finding Plaintiff not credible.  See
Capoferri v. Harris, 501 F.Supp. 32, 37 (E.D.Pa.1980), aff'd, 649 F.2d 858 (3d Cir.1981).

Next, the ALJ pointed out that Plaintiff has not sought treatment for his emotional
condition, whereas "he did follow treatment consistently for his right thumb condition prior to
the alleged onset date, and, with treatment, that condition resolved in less than a year."  Tr. 23.
Dr. Waters diagnosed Plaintiff with "adjustment disorder with depressed mood" but concluded
that Plaintiff's "mental status plays a less significant role in his occupational limitations."  Tr.
291.  Dr. Sanford likewise concluded that Plaintiff's psychiatric impairments were not severe
and that Plaintiff had no restrictions in daily living activities, no difficulties in maintaining
concentration, persistence or pace, but had mild difficulties maintaining social functioning.  Tr.
303.  Overall, Dr. Sanford found Plaintiff's allegations "partially credible [but] he does not
meet/equal the Listings."  Tr. 305.  The ALJ properly credited this testimony.

Additionally, the ALJ considered the explanation Plaintiff provided for not seeking
medical treatment for his emotional disorder based on the cost of such treatment (Tr. 44), but
found that this justification was not credible based on his seeking treatment for other symptoms.
The ALJ's determination was thus consistent with SSR 96-7p.  It does not appear that Plaintiff
offered any explanation for the non-treatment of his "severe headaches" or other alleged
symptoms.  Tr. 289.

In sum, in compliance with SSR 96-7p, the ALJ did provide  "specific reasons for the
finding on credibility, supported by the evidence in the case record," which was "sufficiently
specific to make clear to the individual and to any subsequent reviewers the weight the
adjudicator gave to the individual's statements and the reasons for the weight."  SSR 96-7p.  It

appears to the Court that the ALJ considered claimant's complaints of pain, but since Plaintiff's

allegations were unsupported by medical evidence, the ALJ properly evaluated Plaintiff's

credibility.  See Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993); see also Reefer v.

Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (finding that examining courts should generally defer

to an ALJ's credibility determination).

### D. The ALJ Properly Evaluated and Weighed the Medical Evidence of Record

Plaintiff accuses the ALJ of substituting his opinion for that of the medical experts, thus

not properly weighing the medical evidence.  Schonewolf v. Callahan, 972 F. Supp. 277, 287

(D.N.J. 1997) (citing Kent v. Schweiker, 710 F.2d 110, 112 (3d Cir. 1983) (holding that an

ALJ's own medical analysis which is contrary to medical evidence is invalid).  Plaintiff rests

this allegation on the absence of any finding linking Plaintiff's alleged symptoms to his lipoma.

Pl. Br. 24.  Plaintiff points to Dr. Colletti's note that the parotid gland lipoma could be a cause

of Plaintiff's hearing loss; Dr. Colletti, however, is a general ophthalmologist, and did not

conduct a hearing exam.  Tr. 334.  Dr. Colletti did conduct an eye exam and found that Plaintiff

could work with large objects, and would not need to take unscheduled breaks during an 8-hour

workday.  Tr. 332-334.

Dr. Moster, a neuro-ophthamologist, found no explanation for Plaintiff's alleged

neuropathy or vision loss since there was "no extension [of the parotid lipoma] anywhere near

the optic nerve."  Tr. 329.  Dr. Moster recommended that Plaintiff undergo a blood test and an

MRI of the optic nerve to check for other causes of his slowly progressive vision loss.  Tr. 329-

331.  Dr. Moster did note that he believed Plaintiff's lipoma "has obviously grown enough to

cause hearing loss and presumably could also have grown intracranially caused the optic

neuropathy," however, Dr. Moster did not conduct a hearing test and there is no evidence that Plaintiff ever pursued the recommended MRI.  Tr. 331.  Drs. Moster and Colletti were unable to attribute any medical cause to Plaintiff's vision loss.  Tr. 329, 332.  As discussed above, Dr. Golish found only slightly decreased hearing in the left ear, and Dr. Klausman found that Plaintiff was able to "hear a normal conversation."  Tr. 315, 276.

Additionally, Plaintiff's reliance on the observations of Drs. Waters, Bresalier, and Klausman is misplaced.  Dr. Waters is a psychologist, and did not conduct physical medical testing (Tr. 291), and Dr. Bresalier last saw Plaintiff in 2001, at which time he determined that the benign mass had been successfully removed.  Tr. 207.  Although Dr. Klausman did observe the recurrent lipoma, he did not recommend any further treatment or report that the lipoma would preclude Plaintiff from work-related activities.  Tr. 273-277. Therefore, the Court finds that the ALJ properly evaluated and weighed the medical evidence of record and reasonably concluded that a correlation between Plaintiff's alleged symptoms and his parotid gland lipoma had not been shown.

## III.    CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination that Plaintiff is not entitled to DIB or SSD is supported by substantial evidence.  As a result, the Court will affirm the ALJ's decision.  An appropriate order shall enter today.


Date:   7/23/2012                                    /s/ Robert B. Kugler
                                                     ROBERT B. KUGLER
                                                     United States District Judge